UNITED STATES DISTRICT COURT
DISTRICT OF OREGON

DEBRA POWELL, an individual,

                                            Case No. 2:19-cv-1077-JR

        Plaintiff,                         FINDINGS OF FACT &
                                                CONCLUSIONS OF LAW

        v.

JOHN DENNIS RASMUSSEN, an
individual, COLTON RASMUSSEN,
an individual, IAN RASMUSSEN, an
individual, and HEIDI
RASMUSSEN, an individual,

        Defendants.

TERRA-MAGIC, INC., an Oregon
corporation, and TERRA-MAGIC SEEDS, LTD.,
an Oregon corporation,

        Nominal Defendants
_____

1 -   FINDINGS OF FACT & CONCLUSIONS OF LAW

Russo, Magistrate Judge:

Plaintiff Debra Powell initiated this action on July 12, 2019 alleging conversion, replevin, unjust enrichment, breach of fiduciary duty, waste of corporate assets, and shareholder remedies under Or. Rev. Stat. § 60.952 against defendants John Dennis Rasmussen (Dennis Rasmussen), Colton Rasmussen, Ian Rasmussen, and Heidi Rasmussen.  Terra-Magic, Inc. and Terra-Magic, Seeds, Ltd. are nominal defendants.

## INTRODUCTION

Terra-Magic, Inc. (TMI) is a Union County, Oregon farming business that has been in plaintiff's family since 1976.  Plaintiff resides in Colorado while her brother, Dennis Rasmussen, resides in Union County, Oregon.  Among other assets, TMI owns an approximately 2,066-acre farm just outside La Grande, Oregon, and associated farm equipment.  In about 2004, plaintiff and Dennis Rasmussen founded Terra-Magic Seeds, Ltd. a company focused on seed processing. Plaintiff and Dennis Rasmussen each own a 50 percent share of both Terra -Magic Seeds (TMS) and TMI.[1]  The Court generally refers to the two entities as TMI.

Since the early 2000s, Dennis Rasmussen and his sons managed Terra-Magic, Inc.'s business affairs.  Defendant Colton Rasmussen managed the Terra-Magic Farm and was also a representative of Terra-Magic Seeds.[2]  Plaintiff alleges the Rasmussen defendants established a variety of entities such as ViraKopis Seed Company, Oil Renewable Environment Society

---

[1]  Prior to 2003, plaintiff and Dennis each owned 18.3 percent of TMI's shares and their brother Richard and sister Linda also owned an 18.3 percent interest.  After a dispute in 2003, plaintiff and Dennis Rasmussen purchased Richard's and Linda's 18.3 percent shares respectively for $500,000 each.  Dennis arranged for a loan of $2.4 million to TMI to buy out the shares and to fund additional improvements to the farm's irrigation system.  In addition, the loan proceeds were used for plaintiff and Dennis to purchase their mother's TMI shares for $100,000 each, resulting in plaintiff and Dennis each owning 50 percent of TMI.  Although the record supports a distribution from TMI to plaintiff in the amount of $100,000 which she then transferred to her mother, it is unclear if Dennis also paid $100,000 to his mother for her shares.  See Defendant's Closing Argument Ex. 2080; Plaintiff's Transcript at pp. 65-66.
[2]  In 2006, defendant Dennis Rasmussen turned over management of the farm to Colton Rasmussen at which time Colton took over control of the company checkbook.  In 2017, Dennis resumed responsibility for managing the farm and took back control of the TMI checkbook in April 2017.

2 -    FINDINGS OF FACT & CONCLUSIONS OF LAW

(O.R.E.S.), Earth, Energy and Humanity Society and Successors ("E.E.H.S.S." or "E.E.H.S."),

Acquiring Resourceful Technologies Society ("A.R.T.S."), and Universal Laws Awareness and

Enlightenment Society (U.L.A.E.S), to siphon value away from TMI.  Among the uses of the

alleged diversion of funds was:

> to make a down payment in the purchase of a farm at 64019 Ruckman Road, Cove,
> Oregon (the "Ruckman Road Farm") on or about January 29, 2015. Colton
> Rasmussen and his family took possession of the Ruckman Road Farm at or about
> the same time. Colton Rasmussen, with the assistance and/or knowledge of the
> other Rasmussen Defendants, soon thereafter began diverting hundreds of
> thousands of dollars of Terra-Magic, Inc.'s resources to the Ruckman Road Farm,
> including fertilizer, chemicals, seed and equipment. Colton also used Terra-
> Magic, Inc.'s credit accounts with various vendors, again with the knowledge and/or
> assistance of the other Rasmussen Defendants, to improve the buildings and other
> infrastructure on the Ruckman Road farm. On or about August 18, 2018, Colton
> Rasmussen ostensibly purchased the Ruckman Road Farm from O.R.E.S., though
> not in an arms-length transaction, and maintains title and possession today. More
> than $100,000 dollars of Terra-Magic, Inc.'s equipment remains on the Ruckman
> Road Farm as of the filing of this Complaint, despite Plaintiff, on behalf of Terra-
> Magic, Inc., specifically requesting, in writing, that the equipment be returned to
> the Terra-Magic farm.

Complaint (ECF 1) at ¶ 17.

Plaintiff further alleges that defendants did not ensure Terra-Magic's bills were paid and

illegally obtained loans on behalf of TMI.  Dennis Rasmussen is currently leasing the farm to a

third party, Curtis Troyer, for approximately $440,400 per year. Plaintiff alleges she was not

informed of the lease and has not shared in the proceeds.  Among other forms of relief, plaintiff

seeks entry of an order to liquidate.

On July 1, 2020, asserting ongoing malfeasance in the operation of the TMI entities,

plaintiff filed a motion for appointment of a custodian.  Defendants Ian and Dennis Rasmussen

responded to the motion on July 30, 2020, and asserted any malfeasance was attributable to Colton

alone and that Dennis wanted to exercise an irrevocable election to purchase plaintiff's shares

effectively resolving the matter.

3 -   FINDINGS OF FACT & CONCLUSIONS OF LAW

Pursuant to Or. Rev. Stat. § 60.952(6), "[a]t any time within 90 days after the filing of a proceeding under subsection (1) of this section, or at such time determined by the court to be equitable, the corporation or one or more shareholders may elect to purchase all of the shares owned by the shareholder who filed the proceeding for their fair value."  After an election to purchase is filed, "the proceeding filed under subsection (1) of this section may not be discontinued or settled, nor may the shareholder who filed the proceeding sell or otherwise dispose of the shareholder's shares."  Or. Rev. Stat. § 60.952(6)(d).

Defendant Dennis Rasmussen filed his notice of election to purchase plaintiff's shares on August 3, 2020. He also filed a motion to stay the lawsuit and proceed directly to determine the fair value and terms of purchase of plaintiff's shares.  The Court granted the stay (staying all other claims) and converted the case to a fair value proceeding.  Or. Rev. Stat. 60.952(6)(f) (The Court shall stay action for shareholder remedies to determine fair value and terms of purchases of shares). The Court did allow discovery to continue relative to whether the alleged illegal, oppressive, or fraudulent conduct had an impact on the share value and Dennis Rasmussen's ability to pay for the shares.  See Or. Rev. Stat. § 60.952(5)(a)(A-B).

After discovery, the Court held a six-day evidentiary hearing to determine fair value (August 13, 16-18, 31 and September 1, 2021).  In addition, in October 2021, the parties submitted comprehensive and lengthy written closing arguments.  Having considered the arguments and the evidence, the Court submits the following Findings of Fact and Conclusions of Law.

<u>DISCUSSION</u>

A.    Oppressive, Illegal, and Fraudulent Conduct

Plaintiff asserts defendant Dennis Rasmussen's malfeasance harmed TMI's value contending that he personally benefitted in the amount of $1,889,657 through misappropriation of

TMI assets among other harms. The vast majority of the harms identified by plaintiff's expert Serena Morones relate to benefits directly accruing to Colton Rasmussen. Although plaintiff asserts Colton and Dennis Rasmussen acted in concert, the claims against Colton are generally not at issue in this fair value hearing and are largely related to the stayed claims. Although the Court permitted Colton Rasmussen to participate in the hearing so as not to prejudice any defenses he may have to the claims against him, a full adjudication of these claims is beyond the scope of the fair value hearing.[3] Moreover, as discussed below, the parties stipulated to the valuation criteria for TMI based on a relatively simple calculation of the entity's hard assets. The vast majority of the alleged malfeasance relates to misappropriation of funds without connection to the hard assets with limited exceptions such as an alleged forced sell of a grain auger, JD45 drills, a blue disc, and a John Deer farm vehicle. See, e.g., Plaintiff's Exhibit 281 at p. 3, ¶ 8 (On May 11, 2019, Dennis Rasmussen writes that Colton's mismanagement ran up TMI debts necessitating the "sell [of] a grain auger, the JD 455 drills and the blue disc."); Plaintiff's Exhibit 327 at pp. 13-14, ¶¶ 55-57 (Serena Morones notes that Colton assumed possession of a Terra-Magic utility vehicle without purchasing it causing $8,934 in damage to TMI). Although the value of the John Deer vehicle has been ascertained by plaintiff, the value of the other items mentioned by Dennis is not clear. Moreover, recovery for plaintiff's share of equipment misappropriated by Colton, with or without Dennis' assistance, is better adjudicated through plaintiff's conversion claim and decided by a jury. In addition, the Court lacks sufficient evidence to determine whether the alleged misappropriation of money and TMI product and supplies had an impact on the share value or whether it merely

---

[3] Dennis Rasmussen asserts that in each of the areas of alleged misappropriation of monies from TMI, Colton acted alone. As noted, plaintiff asserts the two acted in concert. Where two or more persons become jointly or severally liable in tort for the same injury to person or property, there is a right of contribution among them even though judgment has not been recovered against all or any of them. Or. Rev. Stat. § 31.800. Thus, in order to avoid risk of liability by Colton Rasmussen to Dennis Rasmussen based on the evidence produced at the fair value hearing and because of the potential conflict between them, the Court, out of an abundance of caution, permitted Colton's participation. However, the result was to expand the scope of the hearing well beyond its purpose.

impacted the value of distributions due plaintiff during TMI's operation. These alleged

misappropriations are recoverable through ordinary tort claims such as conversion.[4]

As noted above, Dennis Rasmussen asserted he was unaware of any malfeasance allegedly

perpetrated by Colton Rasmussen. During the hearing Colton asserted that to the extent he

appropriated TMI funds, equipment, or product, it was merely part of his unwritten compensation

package. Plaintiff asserts Dennis Rasmussen is jointly and severally liable for misappropriation

by Colton (and his other son defendant Ian Rasmussen) because he:

> in effect taught his sons how to misappropriate Terra-Magic funds. He consulted
> with them in setting up religious non-profits in 2014. In 2015, he **conspired** with
> Colton to acquire the Ruckman Road farm using, in large part, Terra-Magic money.
> It was Dennis' company, O.R.E.S., that initially usurped Terra-Magic's feed
> business before handing it off to Ian and his company, A.R.T.S. In 2015 and 2016
> he was a **co-conspirator** in the scheme to sell collateral pledged to the U.S.
> Government, by falsely representing that it was owned by O.R.E.S., Dennis' non-
> profit. As late as July 2018, Dennis was actually plotting with Colton on how to
> escape the penalty the government imposed on Terra-Magic as a result of the illegal
> sale of that collateral. To this very day, in July 2021, Dennis is still working **in
> concert** with Colton and Ian in opposition to Plaintiff's efforts to recover
> misappropriated Terra-Magic funds.

Plaintiff's Corrected Trial Memorandum (ECF 155) at p. 20-21 (emphasis added).

A civil conspiracy is a combination of two or more persons by concerted action to

accomplish an unlawful purpose, or to accomplish some purpose not in itself unlawful by unlawful

means. Yanney v. Koehler, 147 Or. App. 269, 273, 935 P.2d 1235 (1997). It is a theory of mutual

agency in which a conspirator becomes jointly liable for the tortious conduct of his coconspirators.

---

[4] It is not clear to what extent existing liabilities, which serve to reduce the value of TMI's hard assets, are
attributable to the alleged fraudulent conduct. To the extent plaintiff asserts the claims against Colton are a soft
asset belonging to TMI, the hearing did not adequately establish the collectability of such asset, the costs associated
with seeking collection, how such asset should be counted (i.e., would plaintiff's portion be 100 percent given
Dennis' alleged conspiracy in the conversion or 50 percent given plaintiff's 50 percent share in TMI?), or whether
Dennis' failure to seek collection constituted a valid business judgment. The better course of action is to permit
plaintiff to continue to seek redress for these alleged harms through the stayed tort claims alleged against Colton in a
jury trial. The claims have not been reduced to a judgment and, as noted, litigating the claims through a fair value
hearing is beyond the hearing's scope and thus cannot be appropriately calculated as an asset of TMI.

6 -   FINDINGS OF FACT & CONCLUSIONS OF LAW

Osborne v. Fadden, 225 Or. App. 431, 437, 201 P.3d 278, 282 (2009).  A civil conspiracy consists of (1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) one or more unlawful overt acts; and (5) damages as a result of the overt act or acts.  Morasch v. Hood, 232 Or. App. 392, 402, 222 P.3d 1125, 1131–32 (2009).  The fair value hearing did not focus on these elements and it is difficult, if not impossible on this record, for the Court to make a finding that there was a meeting of the minds on the object of the conspiracy.  Indeed, there was substantial evidence of animosity between Colton and Dennis.[5]  To hold Dennis Rasmussen responsible, based on a conspiracy theory, for the alleged illegal acts of Colton Rasmussen is beyond the scope of the fair value hearing.  Accordingly, the Court only evaluates illegal, oppressive, or fraudulent conduct on the part of Dennis Rasmussen for purposes of discounts to share value.[6]

In closely held corporations, a breach of fiduciary duty by majority shareholders normally constitutes oppression.  Hayes v. Olmsted & Associates, Inc., 173 Or. App. 259, 265, 21 P.3d 178, rev. den., 333 Or. 73, 36 P.3d 974 (2001); see also Zidell v. Zidell, Inc. (24128), 277 Or. 413, 418, 560 P.2d 1086 (1977) (those in control of the affairs of a closely held corporation have fiduciary duties of good faith and fair dealing toward minority shareholders).

> [T]the court must defer to the business decisions made by the majority shareholders of a close corporation, as long as they are genuine….  Moreover, the existence of one or more badges of oppression in isolation does not necessarily justify relief….

---

[5]  The Court does note the evidence supports Dennis Rasmussen's involvement in the purchase of the Ruckman Road Farm through his O.R.E.S. entity.  But the purchase of the farm, standing alone, is not illegal and while there was substantial evidence that Colton simply converted TMI funds to make payments to Adept Escrow, the Court would have to make a finding that Dennis knew where the money was coming from to find a meeting of the minds on the object of misappropriation of funds to make the Ruckman purchase.  The evidence suggests it is reasonable to conclude that Dennis knew that Colton was using TMI funds, that Colton's compensation package did not include the ability take funds he felt he "deserved" beyond his stated salary, and thus that Colton was illegally appropriating TMI funds.  Nonetheless, this is a question better resolved by a jury as a finding now could conflict with a jury's determination regarding Colton's liability on the stayed claims.

[6]  As discussed below, the Court does not believe a showing of oppression is necessary to prevent the application of discounts, but the issue is currently before the Oregon Court of Appeals in Ybarra v. Dominguez, Case No. A171814, and should that court determine a showing of oppression is necessary, this Court makes a finding regarding oppression.

Instead, [courts] examine the pattern of conduct of those in control and the effect of that conduct on the minority to determine whether, in sum, they show oppression.

Hayes, 173 Or. App. at 266, 21 P.3d 178.

The majority shareholder of a close corporation owes the minority shareholder fiduciary duties of loyalty, good faith, fair dealing, and full disclosure. Delaney v. Georgia–Pacific Corp., 278 Or. 305, 310–311, 564 P.2d 277 (1977); Baker v. Commercial Body Builders, 264 Or. 614, 629, 507 P.2d 387 (1973).  Defendants Dennis Rasmussen and Colton Rasmussen controlled access to TMI's finances and properties as well as access to material information concerning its operation.  Regardless of whether Dennis himself participated in misappropriation of funds or equipment to the determent of plaintiff's ability to receive distributions from the proceeds of the operation, the evidence established he failed to keep plaintiff apprised of material issues affecting TMI's operation and finances so as to breach his duty of full disclosure to her.

On May 11, 2019, Dennis Rasmussen himself demonstrated he failed to, at a minimum, ensure adequate management of TMI and to inform plaintiff of issues regarding operation of TMI for a number of years.  In a letter to plaintiff, in response to her notice that she was sending representatives from her lawyer's office to make copies of company records following his failure to respond to her requests for inspection,[7] Dennis wrote:

> 1) Colton's mismanagement of Terra Magic has caused the destruction of a 3 generation business. Do not believe I am not angry about this. It is a challenge every day to control the anger as I go about the business of Terra.
> 2) Colton somehow managed to run up 2 years worth of chemical and fertilizer with a single supplier, Crop Production Service (CPS). This apparently all began with the 2015 drop year. I was not advised of this until much later. Whenever I made inquiries as to the farm status, I was always told that everything was good. When I was made aware of this condition, it was because CPS was going to bring legal action and not because Colton wanted help-he had obviously been hiding the farms

---

[7]  Plaintiff's request for information came after she received a call from Colton in January 2018 asking for an emergency loan of $45,000 because TMI lacked funds to make an upcoming farm loan payment.  Plaintiff made the loan payment directly to the lender and inquired into Colton's representations about the Farm's financial difficulties and their potential causes.

8 -    FINDINGS OF FACT & CONCLUSIONS OF LAW

condition. The time period was late summer/ fall of 2016. Meetings with CPS began to determine how Terra might retire the debt which by now was well over $400 k and growing wildly with interest charges.

3) Colton maintained this all occurred because of a "bad year" (2015) but could never really show

where the fertilizer and chemicals went. When I tried to run a few calculations, I could not understand how so much stuff could have been applied to the acreage as to do so would have conceivably damaged or killed the crops. At this point there was no progress with CPS, who maintained the charges were valid. However, these years were also when at least 3 different managers were in place for the local CPS facility. Colton maintained there was enough crop that had not been sold to retire the debt if a portion could remain unpaid until the next crop came off. I was able to reach an agreement with Mark of CPS to do this. It was at this point I took the cheque book away from Colton and began monitoring funds from all sources.

4) The following spring it was "discovered" there would not be enough funds to retire the debt as

agreed with CPS. In order to avoid having CPS force Terra into a bankruptcy condition, I asked one of my friends to loan me $300 k for 6 months. Time was running out and Mark was becoming concerned.  I obtained the needed loan in 36 hours even though the man was on vacation in Florida and was able to make a substantial payment to CPS, but was not able to fully retire that debt due to the ongoing debts from machinery purchases made by Colton and other vendors who had been ignored.  Because of of the bridge loan I was able to get, crops were grown with minimal inputs and the operation was cut down to a bare minimum. By late November I was able to fully retire the CPS debt and repay the bridge loan. Terra Magic had survived but was still quite precarious. There was obviously no carry over funds etc. The year is now 2017. While I was wondering how to proceed for 2018 (machinery debt was still very high with many payments at the most inopportune times), matters got worse.

5) Colton was forced to disclose that he a had taken out an FSA crop loan the prior year and had been caught without the grain. In other words he committed a Federal felony by taking a commodity loan for wheat with out having any wheat. The FSA office got a new manager that year and decided to do a spot check of producers having loans. Colton was forced to admit to FSA what he had done. He of course had all kinds of excuses etc. etc. He appeared in Federal court in Portland for trial. Using a public defender, and having a democrat socialist woman judge, he was able to get off with a lessor charge (a misdemenor) and paid a fine of only $500. FSA however came back and fined Terra Magic $32k+ or 10% of the loan as a penalty. Additionally, Terra could not make use of any FSA programs for a number of years. As a result, even if Terra decided to continue farming, there was a question as to whether or not Terra could obtain crop insurance, due to that insurance being a Federal agricultural program.

6) Terra's credibility and my personal credibility within the community was and still is damaged

severely.  Colton doesn't seem to care, he walks around believing people do not know what he did-ha ha what a fool. His answer to the financial problem facing

Terra was to seek an operational line of credit from Financial Plus in Colorado or anyone else dumb enough to make the loan. This would be in addition to the ongoing mortgage payment. I have never known of an operation that could carry both a mortgage and an operational line of credit at the same time and continue to exist. After doing some numbers I made the decision to discontinue the farm operation as it would certainly fail (commodity prices were then and still are very poor). In short, the interest would cause Terra to fail. This I could not allow.

7) I continued to demand that Colton do the taxes for both Terra and Seeds as they would be needed in order to make final decisions regarding the business. Colton did finish Terra's taxes up thru 2016 but failed to finish 2017, even though he was paid to do so. After the 1st quarter of 2018, I told Colton he would have to find another job because Terra would no longer be operating. This action of course made Colton quite angry as expected. However, with his record of deceit I could not take any more chances. It should be noted that 2017 was the first and only time in this farms history that the property taxes could not be paid in full and the 2/3 portion had to be carried into 2018. I also understand that Colton talked you into kicking in approximately $30 k or so to allow him to pay the farm mortgage. This is also the first and only time the farm has not been able to close out a year in the black or at least even.

8) in order to continue stabilizing Terra and running more numbers, I made the decision to lease the land to another operator. This was a hurried up affair, but was accomplished, with funds being received by April 20th. By doing so, Terra would have enough income to continue to pay off the machinery contracts that Colton had accumulated, continue to pay off accounts payable that he had ignored (such as PGG) and begin to truly stabilize the asset value of Terra. True progress was accomplished during 2018. Fortunately, I was able to sell a grain auger, the JD 455 drills and the blue disc. As it turned out, these funds were needed in order to make the farm mortgage payment and property taxes as well as the ongoing retirement of machinery contracts etc. Note the 455 drills were still under contract, which was fully retired at time of sale.

9) A great amount of work has been necessary to bring Terra back into an somewhat stable state so that a lease could be done. Some of the wheel lines had been broken due to wind and had been in the river for 2 years---disgusting. The pivots were in disrepair and the machinery had not been properly maintained. The Wallsinger well had to be cleaned and put back into operative condition. The pump had to be replaced and repairs made to the well motor and head drive. I do not believe that if money to operate had been available, that a season could have been completed. It was that bad. The decision to lease the ground saved the asset value of Terra. Because of all of this and more, I could not get the irrigation bridge done in 2018 and there were a few repairs still needed on the pivots before they became the responsibility of the lessee to maintain. This work is now being completed. It is imperative to complete the bridge prior to water being need on the planted crop east of the river. This is why I have told Debra repeatedly that I cannot be involved with records until the bridge is finished. The bridge will accomplish two things, it will preserve the water right from being declared as abandoned and supply water to the ground as per the lease contract. With the current weather conditions, it is

10 -   FINDINGS OF FACT & CONCLUSIONS OF LAW

imperative to continue construction to avoid loosing credibility with the leasee and avoid any complaints. As I previously stated, when this is done, it will free up time to spend on other concerns.

Plaintiff's Exhibit 281 at ¶¶ 1-9 (sic throughout).  Dennis Rasmussen also notes:

There is also the information regarding Colton's purchase of a small farm. It should be obvious that this is where monies have flowed and I have some ideas as to how Colton did this, but again Terra is the immediate concern as there is no limitation on fraud.

Id. at p. 5.

While Dennis Rasmussen now disavows much of what he wrote, it is clear he failed to appropriately oversee the affairs of TMI in good faith and provide full disclosure of material issues of mismanagement of TMI to the detriment of plaintiff.  Plaintiff was not in a position to know of such issues because control of TMI was maintained by Dennis Rasmussen.  Regardless of how a court defines oppression, this material breach of fiduciary duty qualifies.   Again, Dennis Rasmussen himself suggests as much when he writes:

Just so you know, Colton sent me a text a while back wanting to know if I would sell my shares of Terra to him for a ridiculous price. At one point I thought that if he could swing the financing, it would be a nice easy way to exit Terra, leaving only Seeds and Joy's trust to finish. **Even considering the lack of communication etc. between us, I could not ethically do this as I know he would have gone on with his dark ways.**

Plaintiff's Exhibit 281 at p. 5 (emphasis added).

Thus, to the extent oppression is necessary to avoid application of discounts for minority shareholder status and marketability, plaintiff has demonstrated such oppression.

B.      Fair Value

For purposes of an Or. Rev. Stat. § 60.952(5) remedy, the Court determines the "fair value" of the shares which considers the interests of both the purchaser, i.e., Dennis Rasmussen, and the seller, i.e., plaintiff Debra Powell.  Hickey v. Hickey, 269 Or. App. 258, 273, 344 P.3d 512, 521

(2015).  As noted above, the statute does not define "fair value."  However, the parties generally

agree that valuation of TMI should be based on the value of its hard assets minus its liabilities.

Plaintiff relied on the analysis of her expert Serena Morones and defendants relied on their

expert Tom Sawatski in calculating the fair value of the shares in the TMI entities.  Noting that

Morones' calculation of Colton's alleged misconduct will not be considered for purposes of this

determination, the parties have remarkably similar calculations:

1.    Plaintiff's Calculation[8]

| Description | Fair Value |
|---|---|
| Assets: | |
|   Cash | $247,500 |
|   Due from Defendants | $1,889,657 |
|   TMI - Land | $9,150,000 |
|   TMI - Equipment | $687,525 |
|   TMS - Seed Plant | $775,000 |
| **Total Assets** | **$12,749,682** |
| | |
| Liabilities: | |
|   Payables | $10,779 |
|   Bank Debt, Including Accrued Interest | $1,368,540 |
|   Shareholder Debt | $49,817 |
| **Total Liabilities** | **$1,429,136** |
| | |
| **Net Asset Value, Rounded** | **$11,321,000** |
| | x 50% |
| **Fair Value of Plaintiff's 50% Interest** | **$5,660,500** |

2.    Defendants' Calculation

| Description | | Defendant's FV |
|---|---|---|
| **Assets** | | |
| Cash (TMI Wells Fargo Checking #0958 ) | $ | 247,500 |
| Due from Defendants | | |
| TMI – Land | $ | 9,150,000 |
| TMI -  Equipment | $ | 687,525 |
| TMS - Seed Plant | $ | 775,000 |
| (Other) Wallowa County Grain Grower Stock | | |
| **Total Assets** | **$** | **10,860,025** |

---

[8]  Plaintiff's "due from defendants" category includes prejudgment interest.  The alleged value before interest is $1,410,175

| **Liabilities** | | |
|---|---|---|
| Payables | $ | 10,779 |
| Bank Debt, Including Accrued Interest | $ | 1,368,540 |
| Shareholder Debt (to Debra) | $ | 49,817 |
| Shareholder Debt (to Debra per tax return) | $ | |
| Note Payable to Dennis on TMI Return | $ | 189,676 |
| **Total Liabilities** | **$** | **1,618,812** |
| **Net Assets Value, Rounded** | **$** | **9,241,213** |
| **Plaintiff's 50% of Net Assets** | **$** | **4,620,607** |
| Lack of Control Discount (17%) | $ | (785,503) |
| Lack of Marketability Discount (23%) | $ | (882,074) |
| **Total 50% of Fair Value** | **$** | **2,953,030** |

3.      Discounts

Pursuant to Or. Rev. Stat. § 60.952(6)(f), the Court must determine the "fair value" and the terms of purchase.  The statute does not define "fair value."  In Ybarra v. Dominguez Family Enterprises, Multnomah County Circuit Court Case No. 18CV02722, the trial court determined "fair value" generally must account for the interests of the purchasing shareholder by including discounts and that to justify exclusion of discounts, a plaintiff must demonstrate oppressive conduct.  Ybarra (attached as Exhibit 2 to Defendants' Trial memorandum (ECF 146) at p. 4.

Prior to enactment of Or. Rev. Stat. § 60.952, in an Oregon case involving oppression a court held: "because defendants must purchase plaintiff's shares as a remedy for their misconduct, and the price for plaintiff's shares is therefore based on their f**air value** rather than their **fair market value**, either a minority or marketability discount would be inappropriate."  Cooke v. Fresh Exp. Foods Corp., 169 Or. App. 101, 115, 7 P.3d 717, 725 (2000) (emphasis added).  The legislature's choice to have the Court determine "fair value" in determining the terms of purchase

when the defendant shareholder elects to purchase rather than face claims for oppressive conduct or corporate waste, as opposed to "fair market value," is meant to exclude discounts.[9]

Neither the Oregon Court of Appeals nor the Oregon Supreme Court has addressed the applicability of discounts in an election to purchase context absent a showing of oppression. However, in a case analyzing a similar shareholder oppression statute, the Idaho Supreme Court held minority and lack of marketability discounts are just another fact that a court may consider in determining fair value and rejected their use as a matter of law.  Wagner v. Wagner, 160 Idaho 294, 302, 371 P.3d 807, 815 (2016).  In the case at bar, the Court declines to include discounts for minority status or marketability even absent a showing of oppression given that the sale in this case was forced by defendant's election and thus cutting off plaintiff's shareholder oppression claims.

### 4.    Note Payable to Dennis Rasmussen

Dennis Rasmussen asserts he loaned TMI $175,000 and TMS $25,000 related to the purchase of "corner catchers."  See Defendants' Exhibit 2070, Transcript of Dennis Rasmussen (attached Declaration of Peter Grabiel in Support of Closing Argument (ECF 187) Exhibit 2) at p. 103.  Thus, Dennis Rasmussen asserts he is owed $189,676 carried on TMI's tax return.  However, Colton Rasmussen testified that TMI paid Dennis to reimburse him for money he paid on TMI's behalf and specifically mentioned the corner catchers.  Transcript of Colton Rasmussen (attached

---

[9]  The Oregon courts define "fair market value" as the amount a willing buyer would pay to a willing seller.  See, e.g., Matter of Marriage of Tofte, 134 Or. App. 449, 457, 895 P.2d 1387, 1392 (1995) (In determining the fair market value of an interest in a closely held corporation, our inquiry focuses on the price that the hypothetical willing buyer would pay the hypothetical willing seller.).  That the legislature would choose to require "fair value" in the election to purchase context makes sense given it is a forced sell rather than an arms-length agreement between a willing seller and willing purchaser.  When the legislature uses technical terminology, i.e., terms of art drawn from a specialized trade or field, courts look to the meaning and usage of those terms in the discipline from which the legislature borrowed them.  Comcast Corp. v. Dep't of Revenue, 356 Or. 282, 296, 337 P.3d 768, 776 (2014).  In the construction of a statute, courts shall not insert what has been omitted.  Or. Rev. Stat. § 174.010.

Declaration of Peter Grabiel in Support of Closing Argument (ECF 187) Exhibit 3) at p. 63. The record is insufficient to demonstrate an outstanding loan payable to Dennis Rasmussen and, accordingly, the Court declines to include the "Note payable to Dennis on TMI Return" as a liability in the fair value calculation.

After consideration of the briefing, and the testimony and evidence adduced at the hearing, the Court concludes that the fair value of the shares is equal to a total asset value of $10,860,025 minus liabilities of $1,429,136 for a net value of $9,430,889. In addition, because the liabilities include a loan from plaintiff in the current amount of $49,817, the Court will add this whole amount to the share value payable to plaintiff in addition to 50 percent of the net value.

C.    Prejudgment Interest

Generally, prejudgment interest cannot be recovered in actions at law unless there is an agreement to pay such interest or a statute imposing interest. Newell v. Weston, 150 Or. App. 562, 583, 946 P.2d 691, 704 (1997). Or. Rev. Stat. § 60.952 does not address prejudgment interest. Plaintiff asserts she was harmed by defendant's delay in seeking the election to purchase her shares.[10] As noted above, the statute contemplates the filing of an election to purchase shares within 90 days of the filing of the proceeding. Defendant Dennis Rasmussen filed his election well after this time period. However, the Court permitted the filing as the statute provides the Court with discretion to accept such filing beyond 90 days. In addition, the Court declines to award prejudgment interest under Or. Rev. Stat. § 82.010 related to failure to pay money due or a wrongful failure to return money to the person to which it belongs. The money due plaintiff in

---

[10] To the extent plaintiff asserts an award of prejudgment interest is necessitated by defendants seeking new counsel and seeking other delays, the Court also declines to exercise whatever discretion it has. Although the delays could be viewed as tactical decisions to thwart resolution of plaintiff's case, they were not so blatant as to represent sanctionable conduct but instead fall within the realm of appropriate legal strategy to acquire necessary discovery, etc. The Court further notes that it will entertain any motions for attorney fees following resolution of all claims in the case which may address issues of delay.

15 -    FINDINGS OF FACT & CONCLUSIONS OF LAW

this proceeding could not be determined until the conclusion of the fair value hearing and thus there has been no showing of a sum certain owed at dates certain.  See  Strader v. Grange Mut. Ins. Co., 179 Or. App. 329, 339, 39 P.3d 903, 909 (2002) (even though damages are not ascertainable until issues of fact have been decided, prejudgment interest is proper where it is shown defendant did owe sums certain at dates certain).  Accordingly, to the extent the Court has any equitable discretion to award prejudgment interest, it declines to do so.

D.      Terms of Sale

As calculated above, the fair value due for plaintiff's shares is $4,765,261.50.

Defendant requests the Court order an installment sale for the purchase of plaintiff's shares. The Court must consider any financial or legal constraints on the ability of the corporation or the purchasing shareholder to purchase the shares. Or. Rev. Stat. § 60.952(5)(a)(B).  In addition, the Court shall specify the terms of the purchase, including, if appropriate, terms for installment payments, interest at the rate and from the date determined by the court to be equitable.  Or. Rev. Stat. § 60.952(5)(a)(C).

Dennis Rasmussen asserts he can obtain a loan of up $2,800,000 using the farm as collateral providing him with the ability to pay plaintiff $1,500,000 immediately and then pay the remainder in annual payments with interest at 4 percent.  Given that defendant assumes plaintiff's fair share is $2,953,030, it is not appropriate for the Court to conclude Dennis can make adequate yearly payments to pay the additional $3,265,261.50 that would be due following payment to plaintiff out of the loan proceeds (assuming he can obtain such loan.)  Plaintiff asserts a custodian should be appointed to oversee liquidation of sufficient TMI assets to pay plaintiff this fair value.  Based on the evidence adduced at the hearing, the Court finds this is the only way to equitably compensate plaintiff for the value of her shares in the TMI entities especially in light of her age and health

condition.  Accordingly, plaintiff is directed to submit a proposed partial judgment resolving the election to purchase plaintiff's shares by appointing a custodian to oversee the sale of assets sufficient to compensate plaintiff.  The Court notes that the proposed judgment shall place responsibility for any tax consequences of the sale on plaintiff.  The Court will also entertain a motion for fees and costs incurred in this case related to the fair value hearing.

CONCLUSION

As analyzed above, the fair value of the shares in the TMI entities is equal to a total asset value of $10,860,025 minus liabilities of $1,429,136 for a net value of $9,430,889.  In addition, because the liabilities include a loan from plaintiff in the current amount of $49,817, the Court adds this amount to the share value payable to plaintiff in addition to 50 percent of the net value. The total due to plaintiff, to effectuate the election to purchase her shares, is $4,765,261.50.  By January 19, 2022, plaintiff shall submit a proposed partial judgment as noted above.

DATED this 20th day of December, 2021.


_____/s/ Jolie A. Russo_____
JOLIE A. RUSSO
United States Magistrate Judge